## THE TICELINE.

## THE JUNIOR.

## THE AMELIA.

### (District Court, E. D. New York. February 15, 1921.)

Salvage ☞23—Shipping ☞54—Charterer liable for breaking away of lighter and for salvage.

A subcharterer of a derrick lighter, which moored her at a dock from which she broke away during a storm of which warning had been given several hours before, suffering damage to herself and cargo, and doing damage to another vessel, *held* primarily liable for such damage and for salvage services rendered to her and her cargo.

In Admiralty. Suits by the Tice Towing Line, owner of the tug Ticeline, against the derrick lighter Junior; by the National Lead Company against the derrick lighter Junior and L. Boyer's Sons Company; by the L. Boyer's Sons Company, owner of the steam lighter Amelia, against 500 tons of oil cake, etc., and the National Lead Company; by the National Lead Company against the Junior; and by the L. Boyer's Sons Company against the National Lead Company and Charles A. McNeill and J. Lester Mack, trading as the McNeill Lighterage Company. Decree awarding salvage and damages primarily against the National Lead Company, subcharterer of the Junior.

Park & Mattison, of New York City (H. E. Mattison, of New York City, of counsel), for libelant Tice Towing Co.

Theodore L. Bailey, of New York City (Frank C. Welles, of New York City, of counsel), for National Lead Co.

Frederick W. Park, of New York City, for L. Boyer's Sons Co.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for McNeill Lighterage Co.

CHATFIELD, District Judge. On the 4th of February, 1920, with the wind coming from the northeast, but with a northwesterly storm threatened, of which notice had been given by the Weather Bureau for a whole day previous, with snowy conditions prevailing, and the night setting in with a temperature slightly below freezing, with the snow turning to rain and falling in the form of sleet, the wind increased and forced from her moorings the derrick lighter Junior, at the gas com-

pany dock, just southwest of the opening to the Navy Yard on the Brooklyn side of the East River. The barge Captain Sullivan, which had previously been lying outside of the Junior, was removed by her captain before the storm to a berth behind a projection of the dock. The Junior was under charter (with her captain) from the McNeill Lighterage Company to the National Lead Company, and had been, in turn, chartered by the McNeill Lighterage Company from her owner, L. Boyer's Sons Company. Each of these charters was in the usual form of oral charter; the terms being to pay for the service, to return the boat in good condition, ordinary wear and tear excepted, and to meet unusual expenses connected with the service of the boat, while the wages of the master and the use of the equipment going with the boat were furnished by the owner.

It appears that as the wind became stronger during the night, and as the tide began to run out in the neighborhood of 3 o'clock, the Junior broke from her moorings, apparently at one end, and was forced against the bulkhead in such a manner as to do considerable damage over a stretch more than the length of the boat. Then, all of her lines having broken, she started down the river, striking first a Tice Line tug which had been lying at the Gold Street pier while the master was telephoning the owner. The pilot in charge of the tug had his attention attracted by feeling the shock, and immediately saw the Junior moving away from the Ticeline and subsequently coming in contact with a carfloat at the next pier to the west. Within a short time thereafter, the captain having returned to the boat, the Ticeline started down the river in the darkness and storm, which by that time had turned to snow, after the Junior, which it overtook several hundred feet below the Brooklyn Bridge. The Ticeline ran up under the stern of the Junior, succeeded in getting a line aboard, and maneuvered her in to Pier 7, Brooklyn, where she remained long enough to satisfy the captain that the Junior was able to stay afloat, and that substantial help in the way of pumping would be needed to remove some 2½ feet of water which was already in her hold.

Shortly afterwards he telephoned his own office, and communication was sent to the National Lead Company, and by various messages information was also given to the McNeill Lighterage Company, whereupon the Atlantic, of the National Lead Company, and the Amelia, of L. Boyer's Sons Company, the owner of the Junior, proceeded to the Junior, and each undertook, as best it could, what appeared to be necessary. The Atlantic evidently reached the neighborhood of the Junior before the Amelia did; but, expecting at that time that the cargo might be dumped and the boat capsized, as the water was then over the port rail amidships and the boat was down at one corner, the Atlantic did not attempt to put a pump into the Junior until after the Amelia had come up on the other side and had put her pump into the boat. Subsequently both boats, with the same purpose in mind, but each ignoring the fact that the other was present, shoved the stern of the Junior across the slip, where she could rest more easily against the opposite pier. The Atlantic, meantime, had put her own pump into the Junior, and undoubtedly owing to the greater capacity of the pump was able to remove

more water than the Amelia. They succeeded in pumping out the boat to the point where the pumps sucked by 12 o'clock, and then the Atlantic left, leaving the Amelia standing by and pumping as occasion required, until the middle of the afternoon. Subsequently the Atlantic came back and looked the situation over, and the McNeill, of the McNeill Towing Company, also arrived and remained for a day and a half, seeing that the boat was kept afloat and pumping as needed.

Not only was there damage to the deck cargo, which consisted of $34,-000 worth of oil cake, from water which rose over the deck, but some of the load appears to have been thrown overboard at some time during the voyage, and some damage was sustained by the rails of the Junior. It also appears that the Ticeline suffered the loss of a flagpole and a small break in its rail, at the time the Junior came into collision.

Under these circumstances the first claim is that of the Ticeline for salvage. It is stipulated that the value of the Junior, as damaged, was in the neighborhood of $5,500, and that the damage which she suffered had subtracted some $7,500 or more from her original value. It also appears that a substantial leak was discovered under water in the stern of the Junior, with respect to which temporary repairs were made at different times during the day, when the four tugs were standing by and pumping the boat out. The captain of the Atlantic testified that he had a conversation with the captain of the Junior, and some of the other witnesses have testified that the captain of the Junior was on board of the boat, although the captain of the McNeill has identified the man who was on board as another employé of the Boyer Company, and has testified that it was not the captain of the Junior.

Be that as it may, the captain of the Atlantic testified that the captain of the Junior told him that he was on his vessel at the Gas House dock and had jumped ashore in order to save his life. It further appears from the testimony that the captain of the Junior was located the following morning, both at the dock entrance of the Brooklyn Union Gas Company and in the neighborhood of the Captain Sullivan, where he had some communication with the gatekeeper and with the master of the Captain Sullivan, sufficient to indicate that he had been away and apparently did not know that his boat had gone adrift.

Whether it should be inferred, in the absence of any testimony from the captain of the Junior, that he left his vessel when she first began to pound the dock or break her lines, and remained away until morning, or whether he had left earlier the night before, there is nothing in the testimony to indicate that the captain of the Junior could have done anything to prevent the disaster or to rescue his boat any more expeditiously than was done by the salvors in the case, unless it should be held that it was his duty on the day previous to move his boat to another berth, or that it was his duty to stay on board constantly, and to be on watch, so as to summon assistance if danger was threatened.

It appears that the berth at the Gas Company dock was assigned by the National Lead Company. The McNeill Lighterage Company is evidently a copartnership, which obtained work from the National Lead Company, and which, in this case, made an independent contract to charter the Junior, and is thus by contract obligated to return the boat

and to look to the subcontractor for reimbursement, if unable to fulfill its contract.

We must therefore immediately pass on to the question of primary obligation on the part of the National Lead Company, both for the damages sustained and for fulfilling the obligation of the McNeill Lighterage Company, if the fault be placed for the accident upon the National Lead Company. As has been said, the berth was furnished by the National Lead Company; it had watchmen, who not only were looking out for its yard and the docks, but also had occasion to observe the boats; and the gas company also had watchmen, whose duty it was to take note of the situation. No obligation, of course, rested upon the gas company to protect or take charge of boats lying at its docks, as a matter of accommodation to the National Lead Company.

Conditions were such that a dangerous storm was to be anticipated. Apparently the lines put out by the captain of the Junior were in good condition, and were properly run, and the boat was safely berthed, so far as the captain could anticipate, unless he moved her from that situation. The wind, while blowing down the river, was not of such a nature as to make it negligence for the captain of the Junior to assume that his boat could lie safely moored to the dock, and, as master, he was not obliged to remain with the boat continuously, nor to do more than his contract called for when upon a voyage, or when docking the boat, or when watching her loading, or running her lines. Responsibility for the care of his master's property rested upon him as an employé of the Boyer Company; but general care of the boat at a wharf, the protection of this boat against impending storm, the safeguarding of the boat during hours when the captain was off duty, rested upon the National Lead Company, and it appears from the testimony that they had knowledge that the master was not upon the boat before any danger actually occurred.

Under all the circumstances I do not see that the captain of the barge was guilty of any negligence, and if the captain of the Atlantic is correct, that the captain of the Junior was upon his boat until he was compelled to go ashore in order to save his life, there would seem to be nothing which he could have done more than he did, and the issue comes down as to whether the National Lead Company should have, under the circumstances, had in mind the protection of the boats lying at its wharf, and done something to keep them from getting adrift.

I think, therefore, that the primary obligation for what occurred rests upon the National Lead Company, in the sense that they should be first called upon to answer for the damages resulting. Inasmuch, however, as the original contract was with the McNeill Lighterage Company, the decree must run against the McNeill Lighterage Company, which must answer in damage if the National Lead Company is not able to respond.

Now, as to the separate decrees in the separate actions, a number of situations are presented that must be differentiated. So far as the Ticeline is concerned, I think it is evident from the testimony, that, if the Junior had drifted much further in point of distance, or for any considerable length of time, she would have sunk, and the cargo would have been a total loss. Therefore the services of the Ticeline in rescuing her

and getting her to shore were of considerable value, and undoubtedly were salvage services. It also appears that the Ticeline has a cause of action for damages, which, while not separately pleaded, has been presented in connection with the cause of action for salvage, and I see no reason why the two decrees cannot be awarded in the one action. The Ticeline, therefore, should have a decree for its damages for the loss of its flagstaff and its broken rail. It should also recover for the salvage rendered, but the amount of the salvage must take into account the fact that the captain of the Ticeline mistook the condition of the Junior in assuming that it was not making water rapidly, that it was safe to leave it for some other vessel to come on telephone notification, and that the Ticeline performed very little service in the way of pumping out the water already accumulated. In fact, some of the damage to the cargo may have resulted from the fact that the Ticeline did nothing except tow the Junior to the wharf.

In the second action for salvage, the National Lead Company seeks to recover for the services rendered by its boat, the Atlantic, in saving the Junior from sinking. The Atlantic cannot claim any salvage in protecting the oil cakes, as they were the property of the National Lead Company, and as the Junior was actually being used by the National Lead Company in carrying these cakes. Nor can the National Lead Company recover for salvage of the vessel, if it was merely preventing further loss from its own fault. The services of the Atlantic were evidently, as has been said, more than half of that rendered to the Junior during the forenoon of February 5th.

The Amelia, belonging to the Boyer Company, has made the claim which is embodied in the third action, which is also a claim for salvage; but the owners of the Amelia, ignoring the fact that they were saving their boat for the National Lead Company, have contented themselves with filing a claim for salvage against the oil cakes. The amount of damage to the cargo, which the Amelia prevented by assisting the Atlantic in pumping, is measurable, but was attended with no risk, and does not rise much above an ordinary pumping service.

The McNeill Lighterage Company could not claim salvage, except as between itself and the National Lead Company; but its work must be taken into account in considering the total amount of help present and furnished, although its services, again, were nothing more than standing by and pumping, and do not rise to a high degree of salvage service.

Assuming that the cargo saved from partial or total loss was worth $34,000, that the boat, although sunk to the rails two or three times in the course of the operation, did not go to the bottom, and that the cost of raising it was saved, I think that a total award for the various salvage services of $2,500 would be commensurate. Of this I would allow in the Boyer action, for standing by all day and pumping, the amount asked in the libel, which is $218. The amount which might be claimed by the McNeill and by the Atlantic would certainly represent as much as $500, and the balance should be awarded to the Ticeline.

In the fourth action, in which the National Lead Company claims damages for the furnishing of an unseaworthy boat, in the sense that the servant, the owner of the boat, is alleged to have failed in the per-

formance of his duty, in which action we must separate carefully his relation as servant of the owner, and distinguish these from his duty as the agent or representative of the National Lead Company, it follows, from the fact that the National Lead Company was responsible for the accident, that the libel should be dismissed, but without costs.

In the fifth suit, in which the owner of the boat claims damages for the various items of loss, a decree will be entered directing the payment of the items of damage, including salvage, against the National Lead Company, and with the further provision that the decree shall be satisfied by the McNeill Lighterage Company under its charter, in case the decree is not satisfied by the National Lead Company, or in case execution does not accomplish payment of the claim..

The award for salvage of the boat in favor of the Ticeline, as has been previously stated, should run against the National Lead Company as a part of the damages, and, if not answered or collected from them, must run against the boat, which is thus a guarantor of the payment of this salvage claim. If collected from the boat, then, in turn, the owner of the boat will have the right to look to the McNeill Lighterage Company for reimbursement, and the decree may so provide.

The claim of the Boyer Company for salvage against the oil cakes has already been provided for, in that it can run only against the National Lead Company, and then, in turn, against the McNeill Lighterage Company, as evidently it cannot be satisfied by the owner out of his own property, the boat.

The decree for salvage of the Tice Towing Line will be awarded in the proportion of four-fifths for the oil cakes against the National Lead Company only, and one-fifth for the boat against the National Lead Company, and then against the McNeill Lighterage Company, in case payment is not obtained from the National Lead Company, and against the boat in case neither respond..

The decree in favor of the Tice Towing Line for damages will run against the National Lead Company and the McNeill Lighterage Company, and, if not collected, against the Junior.

Mr. Mattison: Will your honor indicate the proportion in which the owner and crew of the Ticeline will recover?

The Court: It should be ⅔ and ⅓.